**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

FOREST MEADOWS OWNERS ASSOCIATION,

Plaintiff,

v.

STATE FARM GENERAL INSURANCE COMPANY,

Defendant.

1:11-cv-01642-AWI-SKO

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**

(Docs. 9-15, 24-29)

## I. INTRODUCTION

Plaintiff Forest Meadows Owners Association and defendant State Farm General Insurance Company have filed competing motions for summary judgment. For reasons discussed below, Plaintiff's motion shall be denied; Defendant's motion shall be granted.

## II. FACTS AND PROCEDURAL BACKGROUND

On September 28, 2011, plaintiff Forest Meadows Owners Association (hereinafter referred to as "Plaintiff") filed its complaint against defendant State Farm General Insurance Company (hereinafter referred to as "Defendant') asserting two causes of action for breach of contract and breach of the

implied covenant of good faith and fair dealing. In the complaint, Plaintiff alleged as follows:

> "1. Plaintiff Forest Meadows Owners Association ([ ] 'FMOA') is a non-profit mutual benefit corporation incorporated under the laws of California with its principal place of business in Murphys, California. [¶] 2. Defendant State Farm General Insurance Company ([ ] 'STATE FARM') is a corporation incorporated under the laws of the State of Illinois with its principal place of business in Bloomington, Illinois. [¶] . . . [¶] 5. Sometime prior to April 1, 2008, STATE FARM did issue to FMOA its policy of insurance numbered 90-46-2737-2 covering FMOA for the policy term of April 1, 2008 to April 1, 2009 ('THE POLICY')."

Plaintiff further alleged:

> "6. On or about May 9, 2008 Michelle Carpenter ('CARPENTER') was hired by FMOA as a security guard. [¶] 7. On or about September 28, 2008, the former president of FMOA[ ] terminated CARPENTER's employment. He did not consult with or obtain the authority from the Board of Directors of FMOA to terminate CARPENTER . . . . [¶] 8. On or about August 27, 2009, CARPENTER filed suit in the Superior Court of Calaveras County, *Michelle Carpenter v. Forrest Meadows et al.,* Case No. CJ36022; that case was removed to the United States District Court for the Eastern District of California . . . . ('THE CARPENTER ACTION')."

Plaintiff further alleged:

> "10. On or about April 26, 2010 a copy of the complaint from THE CARPENTER ACTION was delivered to STATE FARM along with a request that STATE FARM defend and indemnify FMOA . . . . [¶] 11. On or about May 20, 2010 STATE FARM wrongfully denied coverage and a defense to FMOA . . . . [¶] 13. As a result of the breaches of the policy of STATE FARM, FMOA was deprived of its contractual benefits and incurred and paid more than $270,000.00 in legal fees and costs to defend THE CARPENTER ACTION. [¶] 14. The claims that were enumerated in THE CARPENTER ACTION at the time of the tender of defense to [STATE FARM] were potentially covered under the terms of THE POLICY, including but not limited to the 'OPTION DO – Directors and Officers Liability' Form . . . ."

On December 9, 2011, Plaintiff filed its motion for summary judgment.[1] On February 29, 2012, Defendant filed its motion summary judgment. On March 19, 2012, Defendant filed its opposition to Plaintiff's motion. On March 19, 2012, Plaintiff filed its opposition to Defendant's motion. The parties filed their respective replies to the oppositions on March 26, 2012.

## III. LEGAL STANDARD

[1] Plaintiff's motion, styled as a motion for partial summary judgment, is actually a motion for summary adjudication of the first cause of action for breach of contract.

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325). If the moving party meets its initial burden, the burden shifts to the non-moving party to present evidence establishing the existence of a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538. A court ruling on a motion for summary judgment must construe all facts and inferences in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the motion is unopposed, the movant is not absolved of the burden to show there are no genuine issues of material fact, *Henry v. Gill Industries, Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the movant's assertions of fact to be undisputed for the purposes of the motion and grant summary judgment if the facts and other supporting materials show the movant is entitled to it. *See* Fed. R. Civ. P. 56(e)(2), (3).

## IV. DISCUSSION

***A. Principles of contract interpretation in the context of insurance policies*** – "[I]nterpretation of an insurance policy is a question of law," and "[w]hile insurance contracts have special features, they

are still contracts to which the ordinary rules of contractual interpretation apply." *Palmer v. Truck Ins. Exchange,* 21 Cal.4th 1109, 1115, 90 Cal.Rptr.2d 647, 988 P.2d 568 (1999) (internal citations and quotations omitted). " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract. The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage', controls judicial interpretation." ' " *Ameron Intern. Corp. v. Insurance Co. of State of Pennsylvania,* 50 Cal.4th 1370, 1377-78, 118 Cal.Rptr.3d 95, 242 P.3d 1020 (2010) (quoting *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.3d 370, 900 P.2d 619 (1995)) (internal citations omitted). Accordingly, " '[the court's] goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If [the] language [of the policy] is clear and explicit, it governs." [Citations.]' " *Minkler v. Safeco Ins. Co. of America,* 49 Cal.4th 315, 321, 110 Cal.Rptr.3d 612, 232 P.3d 612 (2010).

If the terms of an insurance policy are not clear and explicit, but "susceptible of two or more reasonable constructions," they are ambiguous. *Ameron Intern. Corp., supra,* 50 Cal.4th at 1378. " 'If the terms are ambiguous . . . , [courts] interpret them to protect " 'the objectively reasonable expectations of the insured.' " Only if these rules do not resolve a claimed ambiguity do [courts] resort to the rule that ambiguities are to be resolved against the insurer." *Minkler, supra,* 49 Cal.4th at 321 (internal citations omitted). "To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer." *Id.* at 322. "[An] exclusionary clause must be ' "conspicuous, plain and clear." ' [Citation.] This rule applies with particular force when the coverage portion of the insurance policy would lead

an insured to reasonably expect coverage for the claim purportedly excluded.' [Citation.]" *Palp, Inc. v. Williamsburg Nat. Ins. Co.,* 200 Cal.App.4th 282, 290, 132 Cal.Rptr.3d 592 (2011).

"The insured has the burden of establishing the claim comes within the scope of coverage, and the insurer has the burden of establishing the claim comes within an exclusion. To prevail, the insurer must establish its interpretation of the policy is the only reasonable one. Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim." *Palp, supra,* at 200 Cal.App.4th at 290; *Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) ("To prevail, the insured must prove the existence of a *potential* for coverage, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*"). With the foregoing principles in mind, the Court now proceeds to address the parties' contentions.

***B. Coverage for "wrongful acts" under Option DO, the directors and officers liability provision*** – The contractual duties generally owed by an insurer to its insured are to defend, indemnify and pay policy benefits. *Campbell v. Superior Court,* 44 Cal.App.4th 1308, 1319, 52 Cal.Rptr.2d 385 (1996). The primary issue in this case is whether Defendant had a duty to defend Plaintiff in the discrimination and wrongful termination lawsuit brought against Plaintiff by its former employee, Michelle Carpenter, and whether Defendant breached that duty by refusing Plaintiff's tender of a defense. " '[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement.' " *Aroa Marketing, Inc. v. Hartford Ins. Co. of Midwest,* 198 Cal.App.4th 781, 786, 130 Cal.Rptr.3d 466 (2011) (internal citations omitted). " ' "The determination of whether the duty to defend arises is made by comparing the terms of the policy with the allegations of the complaint and any known extrinsic facts, and any doubt as to whether the facts create a duty to defend is resolved in favor of the insured." ' " *Advanced Network, Inc. v. Peerless Ins. Co.,* 190 Cal.App.4th 1054, 1061, 119

Cal.Rptr.3d 17 (2010) (quoting *Pacific Indemnity Co. v. Bellefonte Ins. Co.,* 80 Cal.App.4th 1226, 1231, 95 Cal.Rptr.2d 911 (2000)). "[W]hether a particular policy provides a potential for coverage and a duty to defend . . . is a question of law." *Waller, supra,* 11 Cal.4th at 18. " '[I]f, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise . . . .' " *Aroa Marketing, Inc., supra,* 198 Cal.App.4th at 786. Plaintiff contends Defendant had a duty to defend it in Carpenter's action because there was a potential for coverage under Option DO, the directors and officers liability coverage provided in Plaintiff's condominium/association policy. Option DO provides in relevant part as follows:

> "1. We will pay those sums that the insured becomes legally obligated to pay as damages because of '**wrongful acts**' committed by an insured solely in the conduct of their management responsibilities for the Condominium/Association.
>
> 2. This optional coverage does not apply to: [¶] . . . [¶] g. violation of any federal or state civil rights law or local ordinance, including but not limited to discrimination on account of race, religion, set or age; or [¶] h. damages other than money damages.
>
> . . .
>
> 4. The most we will pay for damages because of '**wrongful acts**' as a result of any one '**occurrence**' is the Coverage L – Business Liability Limit shown in the Declarations. This Coverage L limit is also the most we will pay for the sum of all damages because of '**wrongful acts**' arising from all '**occurrences**' during the policy period. [¶] 5. When used in the provisions of this Option DO:
>
> a. '**wrongful acts**' means any negligent acts, errors, omissions or breach of duty directly related to the operations of the Condominium/Association;
>
> b. '**occurrence**' means a '**wrongful act**', including any conduct related to any of these, during the policy period, which results in a claim made in writing or suit filed no later than one year from the end of the policy period."

Plaintiff contends there was a potential for coverage, if not actual coverage, under Option DO because the misconduct alleged in Carpenter's complaint consisted of "wrongful acts." From this, Plaintiff contends a duty to defend was owed. Defendant, on the other hand, contends there was no potential for coverage under Option DO and no corresponding duty to defend because the acts alleged to have been committed by Plaintiff were intentional, not negligent, and were therefore not

"wrongful acts" within the meaning of the option. Defendant further contends that coverage, in any case, was excluded because Carpenter alleged violations of federal and state civil rights laws. Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court finds the term "wrongful acts" as defined in Option DO refers only to negligence, and that Carpenter did not allege negligent conduct by Plaintiff. As a result, Carpenter's claims fell outside the scope of Option DO's coverage for wrongful acts even in the absence of an exclusion. Therefore, Defendant had no obligation to defend Plaintiff under Option DO.

***1. "Wrongful acts" confined to negligence*** – The threshold task in determining whether there was a potential for coverage under Option DO is to interpret the scope of the "wrongful acts" provision. "Wrongful acts," as noted above, is defined to mean "any negligent acts, errors, omissions or breach of duty directly related to the operations of the Condominium/Association." Plaintiff does not argue for any particular construction of this provision, but its position, in essence, presupposes that the provision refers to *negligent* acts and *non-negligent* errors, omissions or breaches of duty. Defendant contends the provision refers only to *negligent* acts, *negligent* errors, *negligent* omissions and *negligent* breaches of duty. In the Court's view, the latter construction is the clear and explicit meaning of the provision, and the only reasonable one. *Oak Park Calabasas Condominium Assn. v. State Farm,* 137 Cal.App.4th 557, 40 Cal.Rptr.3d 263 (2006) (*Oak Park*), is instructive as to why.

In *Oak Park,* a case involving a directors and officers (D&O) liability coverage provision identical in wording to Option DO, the plaintiff Oak Park, a condominium association, had contracted with ECC, a construction company, to repair buildings damaged in the 1994 Northridge earthquake. *Oak Park, supra,* 137 Cal.App.4th at 559. Oak Park later refused to pay ECC amounts due under the contract following several contractual modifications. ECC sued Oak Park and the owners of the condominiums for breach of contract, foreclosure of mechanic's lien, reasonable value of services rendered, failure to release retention proceeds in violation of California Civil Code § 3260 and fraud. Several condominium owners who had been sued by ECC also filed cross-

complaints against Oak Park, alleging Oak Park had negligently handled ECC's claims and breached certain duties to the owners. *Id.* Oak Park tendered the defense of the complaint and cross-complaints to its insurer, State Farm, under a D&O provision defining "wrongful acts" to mean, as here, "any negligent acts, errors, omissions or breach of duty directly related to the operation of the Condominium/Association." *Id.* at 559, 562. State Farm accepted the defense of the cross-complaints but denied a defense of the complaint, stating its " 'liability coverage [was] only for tort liability' " and that it did not " 'insure for a contractual obligation of the type set forth in this lawsuit.' " *Id*. at 560. ECC subsequently obtained a verdict against Oak Park on the breach of contract, retention proceeds and fraud claims, and was awarded $7.1 million in damages. *Id*. at 560-61. Oak Park then brought an action against State Farm for refusing to defend it in the ECC action, with the parties agreeing to phase the action beginning with a bench trial on the issue of coverage. *Id.* at 561. At the close of the first phase, the trial court found no potential for coverage of ECC's action under the policy because "wrongful acts" included only negligent breaches of duty, not contractual breaches, and entered judgment in favor of State Farm and against Oak Park. *Id.*

The Court of Appeal affirmed. *Oak Park, supra,* 137 Cal.App.4th at 566. On appeal, Oak Park argued the word "negligent" as used in the policy only modified the word immediately following it – that is, "wrongful acts" consisted of (1) negligent acts, (2) (non-negligent) errors, (3) (non-negligent) omissions and (4) (non-negligent) breaches of duty, and that, as a result, the category of "wrongful acts" was broad enough to encompass alleged contractual breaches. State Farm, by contrast, argued that "negligent" modified each of the words following it – that is, "wrongful acts" consisted of (1) negligent acts, (2) negligent errors, (3) negligent omissions and (4) negligent breaches of duty. *Id*. at 563. The Court agreed with State Farm, explaining that Oak Park's proffered construction was illogical and could not have been intended by the drafter of the provision (i.e., the insurer): "[I]f Oak Park's construction of the policy were correct, any condominium association could choose to enter a reconstruction, remodeling or renovation contract with a contractor, then decide not to pay the bill, thus shifting the obligation to its insurer. No rational

insurer would wish to undertake such an insuring obligation. It would be literally impossible, from an actuarial standpoint, to set appropriate premiums to guard against the risk that an association would enter into multimillion-dollar construction contracts, and then not pay for the construction work. That type of risk would be virtually impossible to underwrite." *Id*. at 565.

The *Oak Park* court relied principally on *Group Voyagers, Inc. v. Employers Ins. of Wausau,* 2002 WL 356653 (N.D.Cal. 2002) (unpublished), *aff'd*, 66 Fed.Appx. 740 (9th Cir. 2003) (unpublished), which in turn relied on *New Hampshire Ins. Co. v. Westlake Hardware, Inc.,* 11 F.Supp.2d 1298, 1301 (D.Kan. 1998), to hold that the phrase " 'negligent acts, error or omission' means 'negligent act, negligent error, or negligent omission.' " *Group Voyagers, supra,* 2002 WL 356653, at *4. In concluding it would have been illogical for the word "negligent" to modify only "acts" but not "error" or "omission," the *Group Voyagers* court was persuaded by the reasoning of *New Hampshire Ins. Co.* that "it would have been self-defeating for [a] policy to limit coverage to negligent acts, while at the same time covering intentional errors and omissions . . . . [T]he policy could have been phrased to cover any 'error, omission, or negligent act,' had the parties so intended." *Id*. at *3. Pursuant to the foregoing authority, the Court finds that the term "wrongful acts" as defined in Option DO means negligent acts, negligent errors, negligent omissions or negligent breaches of duty. To conclude otherwise would result in a strained and illogical interpretation of the policy in which coverage could conceivably extend to intentional, reckless or even ultrahazardous errors, omissions and breaches of duty as well as negligent acts. Such an interpretation, as *Oak Park* observed, would create an insuring obligation virtually impossible for an insurer to underwrite. Thus, the Court interprets Option DO as providing coverage only for negligent misconduct.

***2. No facts giving rise to the potential for coverage*** – Having interpreted the "wrongful acts" provision of Option DO, the Court now proceeds to determine whether Defendant was aware of, or whether Carpenter's complaint alleged, facts giving rise to the potential for coverage, thereby implicating the duty to defend. In doing so, the Court is cognizant that Plaintiff, as the insured, has

the burden of establishing the claims came within the scope of coverage provided by Option DO.

As noted above, whether the duty to defend arose is determined by comparing the policy terms with the allegations of the complaint and any known extrinsic facts. Because the Court has concluded that Option DO limits coverage to negligent misconduct, Defendant's duty to defend Plaintiff in Carpenter's action would have arisen under Option DO only if the allegations in the complaint and/or extrinsic facts known to Defendant suggested Plaintiff acted negligently. Plaintiff provides no evidence of facts known to Defendant and extrinsic to Carpenter's complaint that might have suggested a basis for coverage. Instead, Plaintiff simply directs the Court to the complaint as support for its respective position. Carpenter's complaint, which asserted two causes of action for military service discrimination in violation of California Military and Veterans Code § 394 and the Uniformed Services Employment & Reemployment Rights Act (USERRA, 38 U.S.C. §§ 4301 et seq.) and wrongful termination in violation of public policy, alleged as follows:

> "6. On or about May 9, 2008, Michelle Carpenter was hired by Forrest [sic] Meadows Owners Association as a security guard. Initial feedback to CARPENTER was encouraging and provided no indication of problem with performance. [¶] 7. CARPENTER informed Security Manager Angela Young and General Manager, Sarah Masters, in her pre-employment interview that she was serving in the United States Air Force Reserve. CARPENTER disclosed her monthly yearly obligations to Masters. Masters had no complaints. [¶] 8. Upon accepting employment with FMOA, CARPENTER provided the general manager, Sarah Masters with a list of all weekends throughout the fiscal year that CARPENTER would be required to attend Unit Training Assemblies (UTA[ ])[.] CARPENTER also verbally notified Masters that CARPENTER was obligated to serve, at the very least, two full weeks on military orders to fill her requirements. Masters was pleased by CARPENTER's military service and indicated there would be no issues with CARPENTER missing certain work days to fulfill her military duty. [¶] 9. CARPENTER proved to be an exemplary employee and received praise and thanks from the company for her outstanding performance. Masters often expressed to CARPENTER how glad she was to have hired CARPENTER. CARPENTER was both excited and happy to be an employee of FMOA. FMOA was often short handed and as a result, CARPENTER often worked off hours on short notice."

Carpenter's complaint further alleged:

> "10. In or about July 2008, Young, security manager, was terminated and Veronica Lind was promoted to Young's previous position of security manager. CARPENTER was asked, and agreed to work LIND's previous schedule. [¶] 11. In or about July 2008, CARPENTER was notified by her Air Force supervisor that she was ordered to attend military training the first two weeks of September, 2008.

> Within a few days of being so notified, CARPENTER notified her employers at FMOA verbally and by leaving a note on Lind's desk. [¶] 12. On or about August 31, 2008, CARPENTER completed her shift at FMOA and drove to Travis AFB to attend her military training. On or about September 5, 2008, upon returning to her unit office CARPENTER was informed by a Sergeant Martzen of the 349 Medical Dental Squadron of the Air Force Reserves that a Veronica Lind had called to check if CARPENTER was indeed attending military training. CARPENTER's training was confirmed to Lind. [¶] 13. On or about September 12, 2008, Lind phoned CARPENTER to ask if she would still be attending military duties on the weekend of September 20th and 21st. CARPENTER informed Lind that she could not work at FMOA on September 20th and 21st due to military obligations. Lind agreed to remove CARPENTER from the schedule until after September 21st and asked that CARPENTER stop into the office at her convenience to pick up her new schedule[.]"

Carpenter's complaint further alleged:

> "14. On or about September 26, 2008, following completion of CARPENTER's UTA, CARPENTER called the guard station at FMOA to retrieve her work schedule for the following week. CARPENTER spoke to Mike (Last Name Unknown), a recently hired security guard. Mike informed CARPENTER that she was not on the schedule, moreover, he informed CARPENTER he was under the impression he was hired to work CARPENTER's hours. [¶] 15. On or about September 28, 2008, CARPENTER went to the FMOA to pick up a copy of the following months schedule . . . . [¶] 16. The following morning, CARPENTER received a voicemail from Lind asking her to come in for a 'meeting regarding her employment.' CARPENTER returned Lind's call and agreed to meet Lind the following day at 2:00 p.m. Present at the meeting was Lind, CARPENTER and a member of the Home Owners Board, (name unknown). Lind informed CARPENTER that she had done her job well and that she was a 'great employee,' however, they were terminating her because she had too many guards on staff. CARPENTER was then given a letter stating, 'Due to scheduling conflicts, in respect to the fact that you are unavailable during your specified work weekends, we are terminating your employment with FMOA.' The letter was signed by Bob Netherly, FMOA Board of Directors."

Carpenter's complaint further alleged:

> "17. CARPENTER was confused and hurt. She had received only praise for her performance, moreover, her military training was disclosed prior to her hire and in fact, CARPENTER was praised for serving in the military. Even including her military exercises, CARPENTER never received any warnings, reprimands or other remonstrations pertaining to her schedule availability. [CARPENTER's] military training was the only impediment to [CARPENTER's] reliable performance of her security duties on the weekend. [¶] 18. CARPENTER was unable to find civilian work and was forced to file for both Unemployment Benefits and Temporary Aid for Needy Families in order to support herself and her young daughter. CARPENTER lost all interest in things she had previously enjoyed, including volunteering as a fire fighter and volunteer CPR instructor. CARPENTER sought counseling to deal her [sic] emotional distress of being terminated from FMOA."

Plaintiff contends the foregoing allegations alleged conduct within the policy's definition of

"wrongful acts," triggering the potential for coverage. Defendant, conversely, contends the allegations established only intentional, as opposed to negligent, misconduct, and therefore did not allege "wrongful acts" of any kind. Having reviewed the pleadings of record and all competent and admissible evidence submitted by the parties, the Court finds the allegations only encompassed intentional misconduct and, as a result, could not have given rise to the potential for coverage under Option DO's wrongful acts provision. Thus, the Court is compelled to agree with Defendant.

Because Option DO provides coverage only for "wrongful acts" arising out of negligence, Plaintiff must show Carpenter's claims could conceivably have encompassed negligent conduct. That was not done here. Plaintiff contends in conclusory fashion that the allegations "clearly meet the policy's definition for 'wrongful acts'," but provides no argument or evidence to explain how the misconduct it allegedly committed might have been negligent in any sense. Under these circumstances, Plaintiff cannot show Carpenter's claims fell within the scope of coverage. In the Court's view, Carpenter's claims of discrimination and wrongful termination in violation of public policy could not have fallen within the scope of coverage because they necessarily involved intentional, not negligent, misconduct by Plaintiff. "A termination affirmatively undertaken . . . in violation of public policy cannot be the result of negligence because liability '*necessarily* involves willful and intentional misconduct' based upon impermissible motivation," and such termination "can '*only* be established by evidence of an employer's motive and intent to violate or frustrate the law(s) declaring or establishing fundamental public policy.' " *Markel American Ins. Co. v. G.L. Anderson Ins. Services, Inc.,* 715 F.Supp.2d 1068, 1077 (E.D.Cal. 2010) (quoting *B & E Convalescent Ctr. v. State Compensation Ins. Fund,* 8 Cal.App.4th 78, 95, 98, 9 Cal.Rptr.2d 894 (1992)) (emphasis original). Similarly, "[d]iscrimination is by definition intentional conduct." *Rayburn v. Vons Companies, Inc.,* 2003 WL 42521 (Cal.App. 4 Dist. 2003) (unpublished), at *8.[2]

Even engaging in inferences most favorable to Plaintiff, the Court finds it difficult to envision

---

[2] The Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

how the allegations could conceivably have given rise to liability in negligence. Admittedly, certain jurisdictions recognize a theory of "negligent termination" under which an employer may be held liable for "negligently" terminating an employee (e.g., because the employer improperly relies on erroneous information or fails to investigate before deciding to discharge the employee). *See, e.g., Bumgardner v. Spotless Enterprises, Inc.,* 287 F.Supp.2d 630, 638 (W.D.N.C. 2003); *United Pacific Insurance Company v. First Interstate Bancsystems of Montana, Inc.,* 664 F.Supp. 1390, 1393 (D.Mont. 1987); *Trustees, Missoula County School District No. 1 v. Pacific Employer's Insurance Company,* 263 Mont. 121, 129-30, 866 P.2d 1118 (1993). The jurisdictions that recognize such a tort, however, are few, and Plaintiff has provided no authority to show California is included among them. Even if negligent termination were viable in California, no facts were alleged in Carpenter's complaint to suggest Plaintiff's termination of Carpenter was the result of any negligence. The same is true for the discrimination claim. While there is authority to suggest that certain types of employment discrimination could involve only negligent, unintentional conduct, *see Melugin v. Zurich Canada,* 50 Cal.App.4th 658, 665-66, 57 Cal.Rptr.2d 781 (1996), Carpenter's complaint alleged no facts to suggest Plaintiff's discriminatory conduct was anything other than intentional. Accordingly, the Court finds the facts alleged by Carpenter did not give rise to the potential for coverage under the wrongful acts provision, and thus no duty to defend arose under Option DO. In light of this conclusion, the Court need not address the applicability of the civil rights exclusion.

The only dispute between the parties, as set forth in the pleadings, is whether there was a potential for coverage under Option DO.[3] Because Carpenter did not allege facts giving rise to the potential for coverage under Option DO, the duty to defend was never implicated. Because the duty to defend was never implicated, Defendant cannot be held contractually liable for refusing to accept

---

[3] Defendant dedicates much of its motion to explaining why there was no potential for coverage under a separate business liability coverage provision contained in the policy. Plaintiff, however, does not contend that a potential for coverage existed under the business liability provision, and, indeed, essentially concedes there was no such potential by acknowledging the termination and employment-related discrimination exclusions expressly stated in that provision.

Plaintiff's tender of a defense. *See Great Western Drywall, Inc. v. Interstate Fire & Casualty Company,* 161 Cal.App.4th 1033, 1043, 74 Cal.Rptr.3d 657 (2008). Without a duty to defend, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as well. *See Waller, supra,* 11 Cal.4th at 36 ("[I]f there is no potential for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer"). Accordingly, summary judgment must be granted in favor of Defendant.

## V. DISPOSITION

Based on the foregoing, the motion of plaintiff Forest Meadows Owners Association for summary judgment is DENIED. The motion of defendant State Farm General Insurance Company for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: April 10, 2012

CHIEF UNITED STATES DISTRICT JUDGE